## WRIGHT'S AUTOMATIC TOBACCO PACKING MACH. CO. v. AMERICAN TOBACCO CO.

(District Court, E. D. Virginia. January 15, 1915.)

1. PATENTS ⊙⟶328—VALIDITY AND INFRINGEMENT—TOBACCO PACKING MACHINE.

   The Rose patent, No. 586,076, for a machine for forming tobacco into packages, which is in fact and in terms for improvements upon the machine of a prior patent to the same patentee, discloses invention and is valid; also, *held* infringed.

2. PATENTS ⊙⟶289, 301, 318—SUIT FOR INFRINGEMENT—LACHES—DAMAGES RECOVERABLE.

   Complainant contracted to furnish defendant as ordered tobacco packing machines made under a patent, at a stated price. Upon an unwarranted claim that complainant had violated the contract by refusing to furnish further machines, and that it had been advised of the expiration

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the patent, defendant ceased ordering and built 20 infringing machines which it put into use. Complainant notified defendant by letters that it had been informed of the infringement, which defendant repeatedly denied. *Held*, that delay in bringing suit after such denials was not such laches as would bar the suit, but that under the facts shown, and the patent having expired, complainant was not entitled to an injunction to restrain use of the infringing machines, to treble damages, or to an accounting for profits, but was entitled to recover as damages the profits it would have made on the machines if it had furnished them under the contract.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469, 489–495, 566–576; Dec. Dig. ☞289, 301, 318.]

In Equity. Suit by Wright's Automatic Tobacco Packing Machine Company against the American Tobacco Company. On final hearing. Decree for complainant.

Bill in equity to enjoin infringement of patent, and to recover damages, and secure an accounting for profits.

The facts in this case are, briefly, that about the years 1892 or 1893, the complainant, who had secured the exclusive right to vend and sell the Rose machine, designed for making up tobacco into packets, and duly patented under the laws of Great Britain, caused one of the machines to be imported into this country and placed in the factory of the P. Lorillard Company of Jersey City, N. J., upon a royalty basis of 30 cents a hundred pounds of tobacco. Subsequently, others of these machines, nine in all, were acquired under this arrangement with the Lorillard Company. This machine will be hereafter referred to as the "old Rose machine," which was patented in this country the 1st of August, 1893, patent No. 502,637. Finding that the old Rose machine did not work entirely satisfactorily, the complainant caused Rose to construct a new machine designed somewhat after the old machine, but with additions and improvements added, and nine of these machines, the first on the 16th of August, 1895, and eight others between that date and May 2, 1896, were installed in the Lorillard factory. These new machines were found to be a great improvement, especially as respects economy of service and yield in output; so much so that those first furnished under the old Rose patent were quickly discarded, and the new ones substituted in their place, at the same royalty as paid on the old machines. On the 6th of July, 1897, a patent was procured for this improved and new machine, under No. 586,076, being the patent in suit, and hereinafter referred to as the new machine. Subsequently, the exact date does not appear, the Lorillard Company was assimilated with or acquired by the American Tobacco Company, and thereafter, on the 28th day of October, 1898, a contract was entered into between the complainant and the defendant, whereby the complainant contracted to furnish to the defendant 10 machines, and as many more as it might desire, of the new Rose patent, at the contract price of $3,500 per machine, less a commission of 10 per cent. to one R. L. Patterson, who negotiated the transaction, which complainant agreed to pay, and the defendant agreed to take over the machines then on hand on royalty at a price agreed upon. Under this arrangement, the defendant company acquired in all some 50 of the new Rose machines, and, in addition, some 75 others, which complainant had sold to various tobacco concerns, which afterwards became a part of the defendant company, making in all 125 machines owned by the American Tobacco Company, the defendant here. After making the contract, machines were furnished thereunder from time to time for some years, until by letter of January 29, 1909, a claim was made by the complainant that owing to the increased cost to him of $500 per machine, caused by the advance in labor and materials in the machines, and incident to the United States tariff rates and regulations, the defendant should bear this increase, which it declined to do, and thereupon advised complainant

that it would expect it to live up to its contract, and the defendant would continue to make further purchases under the contract.

In the early part of January, 1910, the defendant caused to be made in its own machine shop 20 machines substantially of the complainant's improved type, and put the same in operation in its plants. This it did, believing, as it says, that the complainant's patent, assuming the same to be valid, had expired, and besides that complainant's letter of January 29, 1909, was in effect a breach of its agreement to furnish the machines, and that the defendant had the right to procure machines as best it could, and it was its duty to secure them in the most economical way, and, notwithstanding which, it was seriously damaged by complainant's conduct. Complainant, on the other hand, insists that there was nothing in the letter of January 29, 1909, to indicate a purpose on its part to break the contract, and that the defendant's claim in that respect was a mere afterthought, as was apparent from its position taken at the time; that the making of the 20 machines by the defendant was a bold infringement of its patent rights, fraudulently and surreptitiously committed; that it had no positive proof thereof, though its suspicions had been aroused, until a short time prior to the institution of this suit; that it corresponded with the defendant on the subject, during the year 1910, especially warning it as early as March 23, 1910, of the existence of its patent, giving the number and date thereof; and that its apprehensions at that time were entirely allayed by reason of the correspondence of the defendant, in which it assured complainant that there was no purpose to infringe the patent, and gave it to understand it would keep the contract in the matter of future purchases; but that notwithstanding that assurance, between January and March, 1910, the 20 machines in question were made, and during that year installed and operated, and have continued so to be up to the present time, resulting in great loss and damage to the complainant; and that the defendant's conduct calls for the strongest condemnation and disapprobation.

Melville Church, of Washington, D. C., and Charles V. Meredith, of Richmond, Va., for complainant.

Junius Parker, of New York City, George W. Rea, of Washington, D. C., and L. L. Lewis, of Richmond, Va., for defendant.

WADDILL, District Judge (after stating the facts as above). The following questions are apparently presented, for consideration: The validity of the patent in suit; whether there was infringement; whether there was such a breach of the contract to furnish machines on the part of the complainant as warranted the defendant in making the machines; whether the circumstances under which defendant infringed complainant's patent in making machines were such as would warrant the court in awarding damages and profits to the complainant, and in trebling the damages so awarded; whether an injunction should issue, the patent having expired; and whether the complainant should be denied recovery because of laches, in the prosecution of its suit.

[1] First. Is the patent in suit valid? If it is not, then the defendant is not liable, and the relief sought cannot be had, and this suit should be dismissed. The patent upon its face purports not to be an original patent, but in terms for improvements upon the machine; the precise description being:

"The present invention relates generally to machines for forming tobacco or other materials having similar characteristics into compact rectangular masses of equal weight and inclosing the same in wrappers. Such a machine is illustrated in United States letters patent No. 502,637, granted to me (William Rose) under date of August 1, 1893, and the present invention relates to improvements upon the machine therein described and shown."

And the patent sets forth in great detail what the features of the improvements in the new invention are, over and above the devices of the former patent, and especially in the following particulars: Provision for an extra inclined guide to direct the front end of the wrapper into position over the mold box; (2) the presser plate which forces the wrapper down into the mold box across the entire width of the wrapper; (3) the fingers of the presser plate which bend the front flap of the wrapper down over the edge of the mold box; (4) the presser foot for making the first fold of the wrapper, and having a toggle which gives the downward movement to the toe portion of the presser foot; (5) the paper clips which enter the ends of the wrapper during the time it is passing from one position to the other, and operated in such wise as to advance with the wrapper, and then return to their original positions for engagement with the next succeeding wrapper; (6) the tabbers which reciprocate bodily across the ends of the packet; and (7) the guard plate, which has a movement towards and away from the mold wheel.

Defendant insists that none of the alleged improvements involve either inventive genius or novelty of design or construction, but merely such matters of mechanical construction as would be apparent to and suggest themselves to one ordinarily skilled in the making and operating of machinery; that there was nothing in the patent that had not been anticipated in the prior art, and especially by the first or old Rose patent, and two other prior patents for somewhat similar devices, issued to Kinney & Butler and De Freest & Wynkoop, respectively; and that whatever advantages there were in the patent in suit over the old Rose patent were two suggestions secured from Fidell and Boetig, and another from Landfear, which last named was sought to be included in the patent in suit, and denied by the Patent Office, and those of the two former were not asked to be patented.

These suggestions of the invalidity of the patent because of lack of novelty of invention, and the alleged anticipation thereof in the prior art, may be said to be common in defenses to suits for alleged infringements, and the mere making of them carry but little weight; especially where, upon the face of the patent, it purports to be the effort of the patentee to develop and improve the art respecting a matter about which he has already made sufficient progress to entitle him to a patent. The real inquiry, in such a case, is whether the proposed claims present something new and useful in the art and involve inventive genius. If so, such claims are patentable, although, in a sense, they may constitute improvements on the old or former appliance. Necessarily, the subject generally would have been considered in the old patent, if then thought of, and developed before securing the patent, but that does not prevent future advancement and discovery beyond what was originally dreamed of, and the extension and development of proposed improvements along the same line, gained by inventive genius and skill, it may be, from experiments with the old appliances. The advance in the science, the improvement in the art, the making of something useful and beneficial out of something theretofore crude and inoperative, however much the original model may appear to be like the perfect design,

is at least what the public is interested in, and is what the monopoly of the patent is granted for, to the end that the real advantage and benefit secured may become the property of the public at the expiration of the patent period. Such, it seems to the court, is the character of improvement in this case, and in the patent in suit, as respects the claims thereof hereinbefore enumerated, something of value is furnished to the state of the art, valuable and useful in the business for which it was designed, adding much to the economy and efficiency of the machine, which was not anticipated either by the original Rose patent, or others, in the prior art, and this seems to have been fully attested, so far as the defendant is concerned, by the fact that, upon the marketing of the new device, the old machine was discarded and abandoned, resulting in a total loss to the complainant, save as to its "junk" value.

Authorities to sustain this view could be cited almost without number, and reference need only be made to the recent case of Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527. An extract from the opinion of Mr. Justice McKenna in that case affords an apt answer to the defendant's suggestion that the machines it had used on heavy royalty for many years contained nothing of especial value over the one it had discarded for the improved machine, and that whatever there was of patentable novelty in the machine in suit was the suggestion of others than the patentee, and was not covered by the patent. He says:

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration. And it recognizes degrees of change, dividing inventions into primary and secondary, and as they are, one or the other, gives a proportionate dominion to its patent grant. In other words, the invention may be broadly new, subjecting all that comes after it to tribute (Railway Co. v. Sayles, 97 U. S. 554, 556 [24 L. Ed. 1053]); it may be the successor, in a sense, of all that went before, a step only in the march of improvement, and limited therefore to its precise form and elements, as the patent in suit is conceded to be. In its narrow and humble form it may not excite our wonder as may the broader or pretentious form, but it has as firm a right to protection. Nor does it detract from its merit that it is the result of experiment, and not the instant and perfect product of inventive power. A patentee may be baldly empirical, seeing nothing beyond his experiments and the results; yet, if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor." Diamond Co. v. Rubber Co., 220 U. S. 435, 31 Sup. Ct. 447, 55 L. Ed. 527.

The validity of the patent in suit, as containing important novel improvements, as well as a combination of instrumentalities, over anything in the prior art, cannot, in the judgment of the court, be doubted.

Second. That complainant's patent, assuming the same to be valid, was infringed, is not disputed by the defendant. One of the new machines made under the patent in suit, and bought by the defendant, was taken to pieces, carried to the machinery plant of the defendant, and reproduced, with the exception of some minor details not of material

importance, though the machine of defendant was made of lighter and less valuable construction than that of complainant's; and the defendant cannot escape liability therefor, although it may have acted under the mistaken supposition that complainant's patent had expired.

[2] Third. Whether there was a breach of the contract to furnish the defendant machines, on the part of the complainant, justifying defendant in infringing and using the machines referred to, and the circumstances under which the infringement occurred, will now be considered.

The conclusion of the court is that while the complainant wrote letters perhaps in an unbusinesslike way to the defendant, complaining of the additional cost to which it had been put in furnishing the machines, and endeavoring to get them to bear this cost, still the letters taken as a whole do not sustain defendant's present contention that complainant purposed abandoning the contract, nor was this correspondence so considered by the parties at the time. The complainant set forth in the letter of 29th of January, 1909, in some detail, the additional cost to which it had been put in building the machines abroad, and the increased expense of importation into this country, and sought to have the defendant assume these extras, but expressly stated that it would make the machines in this country and save the additional expense, if the defendant gave reasonable time to fill its orders; the complainant stating that this request was a reasonable one, as there were then no orders pending for machines. To this letter the defendant replied as follows:

"In reply to your letter of January 29th, would say that if and when we shall desire additional of your machines we will expect to get them upon our order on you in pursuance of the terms of the contract existing between us."

Later in the correspondence between the parties, in which the complainant informed the defendant that it had reason to believe that its patent was being infringed, which the defendant denied, in answer to a letter of the 4th of November, 1910, on the subject of infringement, and inquiring why the complainant was receiving no orders for machines, the defendant under date of November 9, 1910, among other things said: "We do not care at present to purchase foil packing machines."

The defendant manifestly should not have made the new machines, or used the same in its business, and while its conduct in so doing is capable of the interpretation placed thereon by the complainant, namely, that the defendant purposely and surreptitiously infringed its patent, still the court does not feel that this is either a fair view of the transaction, or one that the court, under all the facts and circumstances, would be justified in taking. The defendant apparently dealt disingenuously with the complainant; and before copying the machine, ought in good faith and fair dealing to have advised it of what was proposed to be done. Still, having regard to the magnitude of the defendant's business, the variety of transactions constantly on hand, and the great number of persons to whom it necessarily intrusted the same, scattered over a vast territory in this and foreign countries, and the apparent confusion that existed and resulted therefrom, it does not necessarily follow that there was any improper motive and purpose in what was

done, certainly so far as making the machine was concerned. The defendant evidently proceeded upon the theory that complainant's patent had expired, which the brass tag, claimed to have been taken from one of its new machines purchased from complainant, indicated; and the higher officers of the defendant company, that is to say, the committee composed of the present president of the Lorillard Company, and vice president of the defendant company, and several other vice presidents of the defendant company, who composed the purchasing committee having charge of these matters, took legal advice as to the expiration of this patent, and were advised that it had expired. There was evidently some misunderstanding and confusion about this, growing either out of the fact that the brass tag in question was taken from one of the old and discarded machines on which the patent had expired, or from one of the new machines on which such tag had been inadvertently placed. The opportunity for misunderstanding and uncertainty was still further afforded by complainant's letters being frequently addressed to one official of the defendant company, and answered by another; and, under all the circumstances, the court is disinclined to and does not hold that there was bad faith on the part of the defendant in making the 20 machines in question. Confessedly it should not have used the same after it was warned of the running of complainant's patent. It knew of it on the 23d of March, 1910, about the time of the completion of the machines, and it was, of course, charged with constructive knowledge of the life of this patent; but, under the circumstances, the court adopts the view that it innocently acted and built the machines before the receipt of actual notice.

Fourth. Considering the question of the defendant's liability in this case, while the complainant is clearly entitled to recover for the defendant's infringement of its patent, and the latter cannot escape liability therefrom, still the circumstances under which the infringement was had will tend to affect the extent of such recovery. The complainant demands an accounting by the defendant for the profits arising from the infringement, and asks for treble damages because of the defendant's conduct, all of which can be awarded in a patent suit in equity, if justified by the facts. Rev. Stat. §§ 4921 and 4919 (Comp. St. 1913, §§ 9467, 9464). The court, however, does not think that the complainant in this case is entitled to an accounting of profits for the use of the machines in question, and a recovery upon that theory, nor that the damages awarded should be trebled; but that the recovery should be limited to the damages sustained under the contractual relation with the defendant by reason of the infringement of the patent as claimed. This is a matter of comparatively easy ascertainment; the contract fixed the price at which complainant was to furnish the machines; and, the defendant having admittedly made 20 machines, is liable to the complainant for whatever profits it would have received, if it had furnished those machines, or any other number that it may have made or procured, save from complainant, under the contract, with interest from the time they were made or procured; and an accounting can be had to ascertain the number of machines made or acquired, as

well as what it would have cost complainant to have furnished the same.

Fifth. Complainant insists that an injunction should be awarded to prevent the defendant from the further use of the 20 infringing machines in question, as well as any others made or procured save under the contract with it, and that such machines should be destroyed. This action the court thinks would not be a wise exercise of its discretion in the premises, and refuses to so decree, and to award the injunction. Authorities to support this view may be found (American Diamond Rock Boring Co. v. Sheldon [C. C.] 1 Fed. 870, Underwood Typewriter Co. v. Elliott-Fisher Co. [C. C.] 156 Fed. 588); but, clearly, in this case, the patent having expired since the institution of the suit, there is no need for any injunction, and to destroy the infringing machines under the circumstances, for which the defendant has been required to pay, would avail the complainant nothing, and result in unnecessary injury to the defendant.

Sixth. The defendant insists that the complainant should not be afforded any relief because of laches in prosecuting its suit—that is to say, that the complainant should not have remained in a quiescent mood, after its communication to the defendant of the 23d of March, 1910, as to its suspicions regarding the infringement of the patent, but should have taken steps to investigate and see whether the defendant was in fact doing so, citing Kerr on Injunction, 383—and further that the complainant did not act in good faith in not so proceeding, but bided its time until just before the expiration of the patent, with a view of mulcting the defendant in heavy profits and damages for the use of the machines manufactured by or for it. This position is not well taken, and is based upon a very uncharitable and unjust view of the action of the complainant. It is true, on the 23d of March, 1910, complainant wrote the defendant, calling special attention to rumors that had come to its knowledge, and of its apprehensions regarding the infringement of the patent in suit. The defendant under date of April 13, 1910, promptly answered, assuring complainant that it had been misinformed as to its having duplicated the machine. On the 4th of November, 1910, complainant addressed communications to two different representatives of the defendant, informing it of its apprehensions respecting the infringement, to which defendant replied under date of November 9, 1910, making denial of the charge; and in answer to a further letter from the complainant, under date of November 10, 1910, in which it was asked for a more positive and explicit denial, the defendant on the 19th day of November, 1910, emphasized its previous denial of in any way infringing the complainant's patent. This correspondence naturally assured the complainant that it had been misinformed respecting the infringement, and that its apprehensions were not well founded; and Mr. Wright, its president, testified that he and the complainant had no direct evidence of the infringement until virtually the date of the institution of the suit.

The court is satisfied there has been no laches in the institution and prosecution of the suit of which the defendant can complain. The correspondence between the parties, and the positive denial of the act of

infringement, not only placed the complainant in a quiescent state respecting the same, but it had the right to rely on the assurances given that its rights were not being violated by the defendant; and the latter will not be heard, in the face of these assurances, to place the complainant at a disadvantage for accepting and acting thereon.

It follows, from what has been said, that a decree will be granted the complainant, sustaining his patent, and awarding damages for the infringement, to be ascertained in accordance with the views herein expressed, with costs.